Our first case today is number 4-14-0676, People of the State of Illinois v. Jamie Thomasson. Attorney Hanlon is here on behalf of the appellant. Attorney McNeil is here on behalf of the state. Mr. Hanlon, are you ready to proceed? Yes, Your Honor. Alright, you may proceed. Thank you, Your Honor. May it please the Court, Counsel. Counsel. John Hanlon on behalf of Jamie Thomasson, who is the post-conviction petitioner and appellant, and also on behalf of his family who is here today. Your Honors, this is a first-degree murder conviction, as you know, involving the death of a two-year-old child, Holden Jones. The issue, Your Honors, of course, is whether in this shaken baby syndrome case, whether the circuit court improperly denied this post-conviction petitioner a third-stage evidentiary hearing to put on evidence of ineffective assistance of counsel through the affidavits that are a part of the petition, two of which are from one medical expert, a pathologist, one biomechanical engineer, and also the third affidavit being from an investigator, a board-certified, experienced investigator. That's the issue, Your Honors, whether or not these affidavits should have given rise to an evidentiary hearing for Mr. Thomasson. I think that we pretty much agree on what the standards are, so I certainly won't belabor that. The question, of course, in this circumstance, should second stage have gone on to third stage? And should the state's motion to dismiss have been allowed, is whether the petition, as pled, and in terms of the evidence, gives rise to a substantial showing of a constitutional violation. Pleadings and affidavits for this consideration must be taken as true and must be liberally construed in doing so. So, again, I don't think there's much controversy about those well-stated, often-stated principles. Your Honors, it's clear that this is a shaken baby case, so-called shaken baby case. That's the way it was charged. That's the way the interrogation went. That's the way the pathologist testified as to the underlying actions that led to the death of this child. And that's the way it was argued multiple times, over and over again, by the state in their closing argument. Yet, despite the substantial controversy in the medical field regarding shaken baby syndrome, and that controversy having, of course, been brought into the legal arena, trial counsel did not properly investigate and retain, and or retain, any expert to inform the jury of that controversy, of the really remarkable split that exists in the medical community regarding this very important diagnosis that mattered. That is the underlying issue, of course. Your Honor, it's equally clear that the petition put forth substantial evidence, substantial evidence, regarding the controversy over SDS, shaken baby syndrome. The first of the affidavits that I just mentioned a moment ago was from Dr. Michael Bodden. Dr. Bodden is a very, very well-known, board-certified forensic pathologist from New York. I imagine that his name will pop up many, many times upon a search. And Dr. Bodden's affidavit, which is kind of right to the point, Dr. Bodden's affidavit said that the version of events that I've read Jamie Thomason's testimony and the version of the events that he gave, excuse me, his police statement, the version of events that he spoke to, accident, or at worst, recklessness, is something that I believe is warranted by the evidence in the case and by his knowledge about the deficiencies in this shaken baby syndrome diagnosis and finding and offering by the pathologist in this case. The second affidavit was from Dr. Bannee, B-A-N-N-E-E, a biomechanical engineer. So Dr. Bodden covered the medical aspect of things. Dr. Bannee, the engineer, of course, covered the physics and engineering and science component of this question. And Dr. Bannee's affidavit, which is quite a bit longer and has numerous attachments to it, articles that he has written and other items, gives quite clear evidence, again, of the remarkable controversy that exists in this area. And his opinion is very simply, look, in terms of engineering and biomechanics and physics, this can't be the way that this happened. There is a substantial controversy, yes, but that's his opinion. So that's the second expert affidavit that's in this petition. The third affidavit is from an investigator, William Plutter, who is a board-certified investigator, whose affidavit made clear that he had much experience with SBS cases, that he had significant contacts with experts in the field due to his experience with these cases previously. And it also made clear that he had had conversations with trial counsel after the trial about why there was not an expert. And those, I think, are very telling, and we'll, of course, discuss those today. One of the things that I really want to point out, I can't think of another area of, again, medicine that's come into the legal arena where the founder, the proponent, the originator of the theory has backed off and said, wait a minute, this has all been taken way too far. Dr. Guttschalk, if I'm saying that correctly, was the original writer and proponent of shaken baby, the child is shaken, that the triad of injuries, that that is a likely cause, can be a likely cause of that triad of injuries. And now, as Mr. Plutter's affidavit makes clear, Dr. Guttschalk has, by affidavit, by sworn affidavit, has backed off of that. But didn't Dr. Ralston admit during his cross-examination that there was a split on this issue, and that some people no longer believed in the shaken baby syndrome? Your Honor, yes, that's correct. There was some, what I would not hesitate to characterize as brief, questioning of Dr. Ralston regarding that, but several things. First, Dr. Ralston then stuck with his opinion. So he said, yes, there may be other people out there who don't believe that shaking a baby can cause this triad of symptoms that I saw in this child, but I'm sticking with my opinion. And, Your Honor, you know, with what we see in the post-conviction petition, and all the doctors and other people who are referenced in those documents, I mean, there are dozens of names of medical people, and dozens of studies, and the biomechanical evidence. To ask a few questions on cross-examination of the state's experts about, you know, acknowledging this controversy, frankly, is a drop in the bucket of what could have and should have been done. So I think it was, to put it mildly, a weak effort toward what should have been done. Mr. Hamlin, can I ask you one other question? Yes, ma'am. Didn't the defendant confess to throwing the child eight or nine times onto a mattress or something on the floor in order to toughen this 2-year-old up? He spoke to having essentially what you said, yes, having placed roughhousing. I think that was the word that he used, roughhousing, by standing on the sofa, taking the child, throwing the child onto an air mattress, and the child bouncing off. What's interesting about that is that there was testimony from, I believe, from the mother about a prior injury that the child had suffered because the child liked to jump on the couch. But there's a difference between the child jumping off the couch and being thrown by an adult eight or nine times in a row, toughening the child up. And my question to you is, was that evidence in and of itself sufficient to support the jury's verdict? And if not, why not? Your Honor. Because the jury had the choice to decide between involuntary manslaughter and first-degree murder. Yes, Your Honor. I urge, and I don't mean to offend, I urge, because I know you've looked at the tape or will look at the tape, whatever. Yeah, I looked at it a couple times on the direct appeal and provision case. And if need be, I urge the Court to review it again. Because it shows some interesting things. It shows, first of all, a cooperative person. More importantly, it shows somebody who was terribly upset about what had happened. Terribly upset. It shows a man who was fond of his child and whose statements in the regard that you're referencing clearly go toward, this was an accident. The child, he laughed and liked doing this. He liked playing this game. He liked roughhousing. Mr. Hanlon, your client went to bed when the child was either dead or unconscious. And he knew it. And your client knew it. He could not wake the child. He put the child in the shower. The child was unconscious at a minimum at that point in time. I don't know, I can't remember if there was testimony about time of death. But at a minimum, the child was unconscious. And instead of calling an ambulance, he went to bed and went to sleep. Your Honor, at that point, obviously there were injuries to the child. Obviously. And the reaction to this, though, as much as we might find that appalling, is different than that which led to the symptoms, the medical symptoms, that this pathologist, Dr. Walston, testified were the cause of this child's death. That's after the fact. And certainly there should have been something else done. I won't for two seconds contest that. Well, couldn't the jury determine that that was some evidence of guilty knowledge, that he had done something wrong and caused these injuries to the child? Your Honor, reasonably, honestly, I don't think so. When we look at that tape again, we see, and Your Honor's indicated you've seen it twice, so you recall you see a man who is broken, who is crying, who clearly is in pain. He just killed a two-year-old. And, well, he's clearly in pain, though, because it's a child that he had fondness for and had feelings for. He talked about vigorous play, roughhousing play, that the child enjoyed it. And he also talked about how, well, the child, one of those times, bounced and hit his head. I thought there was testimony also, though, that he was critical of the child because the child was too soft. There was testimony in that regard, yes, Your Honor. There was testimony. I want to go off on just a slightly different slant. I understand what you're saying about the medical affidavits. I don't know that I've ever been involved in a case where I saw an affidavit from a private investigator who was not hired who then continued, apparently, to follow the case or involve himself in the case. And now he's telling us, I mean, essentially it's almost as if he was saying, if I had been the private investigator, this would have been a really different case. I'm trying to figure out what value that affidavit has. Let's just say for the moment I ascribe value to the medical affidavits. His affidavit is, I mean, all private investigators are certified if they're functioning legally. And even if you said I've investigated, typically you're investigating factual matters. Sometimes you might be checking on the availability of expert witnesses. What is there in Illinois that says a private investigator tells an attorney, you probably ought to get an expert witness? And the attorney evaluates it and says, no, I don't need one. I don't understand the purpose of the affidavit. Sure. Well, I think, Your Honor, to answer, it can begin with the fact that they had conversations. Witnesses obviously come in all forms. And this person had a conversation with this lawyer who he's reflecting in that affidavit. And that tells us something about counsel's state of mind as he didn't get an investigator. Excuse me, or did not investigate, excuse me, did not get an expert and did not investigate properly getting an expert. So he's a person who is reflecting on that conversation. Your Honor, I think that the law says that, just by analogy, this is, experts can come in all shapes and sizes in terms of education and experience, et cetera. They don't have to have a particular piece of paper to be able to give expert testimony. I think that by analogy that this is no different. This is a person who has substantial experience. If I, as a lawyer, am going to try a case tomorrow, I'm going to call somebody who I think has experience in these cases and who knows experts out there. And this person gave an affidavit that said that's exactly his status. So I think for Mr. Clutter, the investigator, to offer his, he was in the case up to a certain point, apparently, from the affidavit. He was involved in the case. He worked with trial counsel. And he's reflecting on what he knew and what he could have provided to counsel in terms of the contacts and the suggestions and that sort of thing. I rely on, as a lawyer, rely on all kinds of people who are not lawyers or doctors  Thank you, Your Honor. Your Honor, counsels knew that they had to contest shaken baby. They knew they had to contest it. They filed a motion to bar use of that term at the trial. So they knew that it was going to be a big deal at the trial. So they filed this motion to bar. It was about a year and a half from the time Mr. Thomason was charged to the time that this case went to trial. That motion was litigated about seven weeks prior to the trial. The motion was denied. And at the end of the hearing on that motion, counsel essentially, I'm paraphrasing this precise language that's in the record, of course, but counsel essentially said, well, I guess this is going to be an issue in this case, and I guess I better get an expert, or at least consider getting an expert. I think that that's remarkable evidence that we usually don't see in a case of this nature where the issue later is should he have gotten an expert. And he's saying on the record really right before the start of the trial, saying maybe I should get an expert now. It suggests that the reason an expert did not end up on the stand for the defense is because it was late in the game when he finally realized that. It was really late in the game. I thought he also said he felt Ralston would be honest and answer his questions honestly and admit that there was a controversy over this. And, in fact, Ralston did do that. Yes, Your Honor. The affidavit, I believe, quotes counsel as saying that he thought Dr. Ralston would be fair. And, again, that doesn't make that, in light of all of the evidence that is in the PC record now, that doesn't make that necessarily acceptable or proper strategy. Again, I would submit what happened. I mean, as we look at the documents and we know about Shake and Baby and we look at those few questions, there's so little that was done. I can't, you know, especially when Ralston then stuck with his opinion. But didn't Ralston also say that there was evidence to support the theory? So the defendant said the child was unconscious when he shook him. And there was a theory that had support in medical evidence that you could have retinal hemorrhaging even if you were shaken after you were unconscious. Yes, Your Honor. And that came up to the jury. Yes, it did. Yes, Your Honor. The cross-examination of the doctor we've talked about. Your Honor, this case, I've cited the Popoka case from the Second District. Essentially, this is quite a bit, I think, like that case where counsel had a theory that involved medicine and science. It was about voluntary intoxication and the effect of alcohol. And counsel there essentially served as his own expert. And the court said, you know, if you're going to put this into issue, then you should get an expert. So counsel was ineffective. Here, we know that counsel knew that this was and should have been, it's in the charges, something that he was going to have to, that they were going to have to deal with. So I appreciate your question. I would submit that the Popoka case provides authority to say that he should have gotten an expert. Your Honor, the prejudice component I've addressed in the brief, as I said, this is a shaken baby case from beginning to end. I think that's very apparent. Given the split in medical opinion, one would think that other cases like this have arisen. Do you have an Illinois case that involves this issue? The issue meaning, can you use the terminology? Is it accepted? Some witness testifying, yeah, there's a split, but most of us still think this. I mean, are there any Illinois cases like this? Your Honor, I'll try to get to it. A little bit of a roundabout first. The motion to bar use of the term alleged that the SBS testimony from Dr. Ralston would be a Frye violation. The judge denied the motion. To answer your question a little more directly, I'm not aware of any case that says no expert can get on the stand and use the term SBS. And at this point now, that's not what we're suggesting. We're suggesting that if that happens. I understand. I'm not aware of any case, Your Honor. I assume that you would have cited it if there was one. I would hope so, yes, Your Honor. Mr. Hanlon, you're out of time. I'm sorry. But you'll have time on rebuttal. Thank you, Your Honor. Mr. McNeil? Thank you, Your Honor. Please, the court. Counsel? As Justice Pope pointed out, there were many points in defense counsel's cross-examination of Dr. Ralston, where he elicited inconsistencies or inaccuracies in his initial diagnosis of the cause of death. In other words, Dr. Ralston was a fair and balanced witness. Defense counsel's conclusion that Dr. Ralston would be a fair witness was brought to fruition. That's important here because the most well-settled principle in this case is that which witnesses to call or not call is a matter of trial strategy and won't support an ineffective assistance of counsel claim. People v. Patterson specifically states that whether or not to call an expert witness is a matter of trial strategy that won't support an ineffective assistance of counsel claim. Patterson's main support for concluding that defense counsel wasn't ineffective in that case was defense counsel vigorously and extensively cross-examined the state's expert. The same exact situation in this case. Counsel decided that instead of sort of focusing on a controversy or however much of a controversy it is, instead of focusing the jury on this highly technical, highly medical controversy, it was going to sort of focus on the realistic lesser included of involuntary manslaughter here. They got the lesser included involuntary manslaughter instruction into the jury's hands over the state's objection. So clearly that was a more realistic goal than the Hail Mary of acquittal here because of course there were so many admissions by defendant to the police. How could there ever be a downside for defense counsel to obtain an expert to refute the state's expert? As I just stated, it sort of would take the focus off of the actual facts of the case here or the actual intent of defendant in this case and make it a battle of experts. Well, it could confuse the jury and cause them to go for the Class III felony instead of the murder. I think a sound strategy is to not focus on the controversy there as I'm putting my defense counsel's hat on in this case, which it should be. It shouldn't be a matter of hindsight. In that situation, if you get another expert, it will only, again, focus on the two experts. Which one will the jury believe? As a defense counsel, I would assume the likelihood of the first degree murder verdict if the jury would believe the state's witness or if the jury believes the defense expert's witness. It's kind of an all or nothing thing at that point. Stated another way, I'm acting, not acting, I am a defendant who is broken by what has happened. I'm traumatized by it and probably I did it, but whatever I did was an accident. And I just don't really know very much about the science stuff. All I know is I was taking care of the child and I did things that I guess I shouldn't have. Is that the defense strategy that would be reflected by not calling a witness? The defense was the one who wanted the lesser included instruction of involuntary manslaughter. No, it was. The state objected. Another big thing to consider, which I'm sure the defense counsel did consider here, is that the state's expert is the one who did the autopsy, personally did the autopsy. Theoretically, any defense expert would be already fighting an uphill battle in terms of credibility there. And that, again, like I state, the credibility of the experts would be basically all that would matter at that point. As Patterson and multiple other cases I've cited in my brief point out, in the very rare exception, whether to call an expert witness is a matter of course. It's a trial strategy. Propoka, which the defendant noted, is a second district case that is rife with the hindsight analysis. Well, it would have been better if counsel did this. I mean, going all the way back to Strickland 30 years ago, they say that that's not the way you analyze an ineffective assistance to counsel argument. Of course, hindsight is always going to be 20-20. Here, it was not just a matter of negligence on defense counsel's part to not call an expert witness. In fact, even the investigator himself stated that he was contacted by counsel before trial to get a list of potential expert witnesses. If anything, that suggests that expert witnesses were considered. Instead, he went the route of poking holes in Dr. Ralston's testimony. Again, assuming that any defense expert already has the uphill battle of fighting a credibility war with the man who actually personally observed the injuries on Holden's body and personally did the autopsy. So here, the theory was clearly, this was an accident, I was roughhousing with the boy, and nothing was intentional. It should be involuntary manslaughter. This is a sound trial strategy. And of course, matters of trial strategy are not matters of ineffective assistance to counsel. Since counsel's performance wasn't objectively unreasonable, the first prong of Strickland fails here. Clearly, the second prong would also fail, the prejudice prong. As Justice Polk pointed out, the defendant made multiple admissions in his interrogation with the police, including roughhousing pretty violently with the child and at some point shaking him, whether he was unconscious or dead at the time. He did say that he shook the baby violently. Also, if we're going by the outcome of the proceedings being different, again, the state's expert actually performed the autopsy. As Hamilton pointed out in my brief, we can't assume just because a defense calls an expert that it will automatically be beneficial for the defense. And we can't assume that the state would then not call either Dr. Ralston or another expert to rebut the conclusions of the defense expert. Again, we can go on like that all day long. That's why Strickland warned to not look at these cases through the lens of hindsight. So here, the outcome of the proceedings wouldn't have been different even if we assumed that counsel should have employed and presented an expert witness. Both prongs of Strickland fail here, and so the trial court, of course, the defendant failed to show a substantial constitutional violation in the trial court that was proper in dismissing the post-conviction petition at the second stage. You used the word violent twice and made it sound as if that's what the defendant admitted to. I doubt very much if he said I violently profiled him. He said shaking the F out of him. That's why I said violent. I didn't want to cuss in front of your honors. Yes, the Hamilton quote that's important here is, counsel's failure to call an expert witness is not per se an effect of insistence, even where doing so may have made the defendant's case stronger. Because the state could always call its own witness to offer a contrasting opinion. Some of the things that, just to mention the cross-examination of Ralston by defense counsel, he elicited the testimony that, of course, there are medical experts that believe retinal hemorrhages don't occur from shaking. He admitted that his initial diagnosis of the broken clavicle was either inaccurate or now he just had a different opinion. He admitted that, although not likely, the clavicle could have been broken by jerking him out of his harness. He testified that numerous other types of injuries can cause subdural hematomas and admitted he, of course, didn't know whether Holden's injuries were as a result of the defendant's cross-examination and a matter of sound trial strategy. Lastly, Melberg, also cited in my brief, involved DNA analyses. In that case, the 5th District stated that while the testimony of an expert may have been more effective, as Justice Turner, there is always the possibility that of course an expert may have been more effective in counsel's cross-examination and closing argument. However, we cannot say that failure to produce such an expert fell below an objective standard of reasonableness. The same could be said here as the record clearly reflects that this was not a matter of negligence, just a matter of a trial strategy that wasn't effective as defense counsel had hoped. Are there any more questions? Thank you. Thank you, counsel. Mr. Hanlon, rebuttal. This is Turner's question regarding, again, I'm paraphrasing, what would it hurt for counsel to put an expert on. It brings to mind that, again, and the court knows, all that we're asking in this appeal is to let the circuit court hear these witnesses or witnesses like them hear some testimony and decide, you know, this case was about SBS. And if the circuit court doesn't hear that testimony, and if it rejects it as not credible, that's a whole other matter, obviously. But this case could end in terms of a direct appeal, which has already been affirmed, and a post-conviction appeal now, without any trier of fact, the jury or the court at a third stage evidentiary hearing, about this controversy, hearing medical evidence about the problems with SBS. I think that would be, I just think it would be unfair and wrong and not just. Somebody should hear this evidence and then let the chips fall where they may. Well, Mr. Hanlon, the jury had the option of finding your client acted either knowingly or recklessly. The jury found your client acted knowingly. Explain to me how an expert witness would have changed that finding as to the mens rea that the jury determined. That's right. The state relied on Shake and Baby. That was their argument to the jury. That was their charge. That was the interrogation. That was their argument in closing. If the defense puts on an expert, experts, which say Shake and Baby, they're proceeding on a theory which we in the medical field have great controversy and great questions about and a lot of doubt about, a reasonable jury certainly could say, the state's trying to sell us this Shake and Baby bill of goods. These experts sound pretty credible. Maybe we should think about what he said about accident or about recklessness based on the throwing the child, playing with the child, roughhousing with the child, that sort of thing. They put forth a theory and if there was testimony to reject that theory, that could have a profound effect on any jury. I believe the charge, however, also reflects impact on the child's head. Correct. The circuit court found, and we've talked about this a little bit, but the circuit court found that there was, I think this is the word that the judge used, that there was vigorous cross-examination. Vigorous. This is not meant with the slightest bit of disrespect to the circuit court judge, but at that point I think it's just a word. It's just a word that's taken from the case law that's not supported by what actually occurred in this case. Not supported by the record. When we look at the cross-examination, I think the most important thing to take from it is, why would counsel, if his strategy was purely, let's go for involuntary, okay, shaken baby's going to come in, let's go for involuntary, why ask any questions at all? He knew he had to. He knew. He litigated at pretrial. He asked these questions during trial. He knew that this was an important thing. It was their whole theory of the case. Substantial theory of the case. And that's why he went there. He just did it weekly. Because it was too late in the game for him to get an expert. The record shows that, Your Honors. Thank you, Your Honors. Thank you, counsel. We'll take this matter under advisement and be in recess.